The opinion of the court was delivered by'
Huston, J.
The defendants in error, who were plaintiffs below, claimed in right of their wives; who vyere daughters of James and Mary Stewart, the lands in question situate on Robinson’s run.
The whole case presents a mass of strange, incoherent and contradictory testimony, to which it would not be easy to find a parallel injudicial history. The foundation of the plaintiffs’ claim, is an improvement. Dinsmore states a bill of sale of an improvement to have been máde by Gabriel Walker, to his sister Rebecca Walker, previous to 1776; that this bill warranted the claim of right to her, the lords of the soil only excepted; the witness married Rebecca Walker in 1776. He does not say, whether he continued or took care of the improvement; says he sold it to James Stewart in 1780, who had married his wife’s sister, who lived part of a.year on it, and went over the mountains, and never returned. It is-agreed by all the witnesses, his widow and children returned in 1795. Dinsmore says it was to contain three hundred acres, or perhaps two hundred and fifty, and the price was to vary according as he got the one or the other quantity. He does not state who made the improvement or when made, or on whom it adjoined, or where it was, further than that it was on the waters of Robinson’s run; he does not state what had become of the bill of sale, which was not produced, nor from all I can find, asked for; nor does he tell whether he sold to Stewart by parol or by deed. Two other of the plaintiffs’ witnesses say James Stewart got the land from Gabriel Walker, for his wife’s share of her father’s estate, and do not mention Dinsmore. Two of plaintiffs’ witnes *380 ses say, Gabriel bought the improvement from one M(Minnomy, and paid him and his widow for it. Vague and incoherent as this testimony is, it was all objected to on another ground, perhaps though the objection appears to be general, which I now proceed to state. The heirs of Gabriel Walker, who had died in 1800, and who, it seems had originally held also by improvement, and whose lines were alleged not to be definitively fixed, brought an ejectment, No. 56, of April, 1809, against Mrs. Stewart, alleging she had in her possession some lands belonging to them. Isaac Walker, the brother of Gabriel, was no party to that suit. Mrs. Stewart, in pursuance of a rule of court, took the depositions of sundry witnesses in that cause on the 28th of September, ISO9. That cause was ended, and afterwards, viz.: at August term, 1813, Mrs. Stewart, being dead, her children instituted this suit against the children of Gabriel Walker, and of Isaac Walker. The lands claimed, are part of what was the estate of Gabriel Walker, and part of what was the estate of Isaac Walker, whose son is one of the defendants in this suit. As Isaac was no party to the former suit, and no part of his land in contest, it is clear those depositions are not evidence to affect him or bis descendants. I presume it was alleged, that being evidence against Gabriel’s heirs, who were joined with Isaac’s heirs in this suit, they could be read against both. The plaintiffs need not have joined the heirs of Isaac and Gabriel in this suit, their possession and titles appear to be separate and distinct, and the plaintiff by joining Isaac’s son with Gabriel’s, shall not read against young Isaac, depositions taken in a cause in which neither he nor his father had any interest; to which they were not parties, and of which they had no notice, nor no opportunity to cross-examine. But were those depositions evidence against James Walker (the son of Gabriel) and his tenant Johnston? That depositions taken in a former cause, may be read in a subsequent cause, the latter cause must be between the same parties, or those claiming under the same, parties, and the matter in issue must be the same, or at least part of the same property. I confine myself to questions of property, and not abstract rights. What are the facts here? — Mrs. Stewart claimed land by improvement of which she was in possession, her claim was not defined by lines; the depositions were taken the 28th of September, 1809, .her survey which included her then possession, and took in thirty or forty acres, cleared and occupied by James, was not made until March, IS10. That suit was to determine the right to lands then, and long before occupied by Mrs. Stewart; this suit is to determine the right to land, actually cultivated by James Walker, by his father, and by Boyd from about 1783; the land nowin controversy is not the same, nor is any part of it the same. Walker had no notice that this suit would ever be brought, his right to this land be contested, no notice to cross-examine as to what is now in contest. If Mrs. Stewart’s claims had then been *381 defined, if she had at that time even an ex-official, survey, or any other definite designation of boundary, which showed her claim .to extend into the actual possession and occupancy of James Walker, it would- present a different question; but this was not the case: the proof is clear, and uncontradicted, that she had no survey at the time the depositions were taken, and more than that), she did not, at that time, claim the land now in dispute: this suit, she herself said, arose on her success in the former. Those depositions then, are not evidence in this cause. The witnesses are now all dead, but that does not make the papers evidence, though in some cases it may strengthen an alleged, waiver of formal objections. There is not, however, much room for regret even to the plaintiffs, as much of the contents of those depositions, was never legal evidence in any cause; for example, the declarations of Isaac, not in the presence of his brother, make the strongest part of the evidence against that brother. These declarations were never evidence, if objected to by James; and are not evidence against Isaac’s son, because not sworn to in this cause, or in any cause where he could cross-examine.
I pass over a great part of the testimony, or, as the judge calls it, the conversation of John M‘Miehael with the counsel, and, also, of William Stewart, with the remark, that; much of what each of them related, are conversations with the plaintiffs, or with persons not parties, and no little of it hearsay.
John M‘Michael, however, proves that on the 8t.h of March, 1810, he^made the survey for Mrs.,Stewart, by which the plaintiffs claim; that no notice was given to any of the Walkers; that Gabriel Walker settled in 1793 or 1794, and his improvements continued ever since; that he took part of the land cleared by Gabriel, into Stewart’s survey; that Boyd had settled about 1783, and had sold to James Walker; all his claim, including about forty acres cleared, was taken into the suryey; that Mrs. Stewart did not want to take in this, but. did it on the suggestion of the witness; that Gabriel Walker had said her line would come there— by the bye, he does not say he ever heard Gabriel say so, nor whether he said so while owner of the land or after he had sold to Boyd; he further says he took into that survey twenty or thirty-acres of land, cleared by Isaac, together with a house and still-house.
It also appeared, Isaac had a warrant and survey in 1785, and that Gabriel had a survey about 1785, the lines of which were well known; and, although the draft was lost, yet when the deputy surveyor re-surveyed, in 1817, he followed the old.lines, and made no new marks. Boyd’s fifty acres were within this survey.
It also appeared, that Isaac Walker being dead, his son Isaac took his land at the appraisement under an order of the Orphans’ Court. Also, that Gabriel, being dead, his son James, in 1805, purchased Boyd’s fifty acres, at eight dollars per acre. It further *382 appears, that M‘Michael took into his survey, and now holds the ground on which Branner’s cabin stood, and the land he had cleared, and which J. Stewart once occupied, but how much of the land originally claimed by Stewart, he holds, does not appear. M‘Michael says that he, at the instance of Gabriel Walker, left part of what he intended to have taken, for Stewart.
It is also sworn that Thornburgh, in another quarter, took in forty or fifty acres of what Mrs. Steioart claimed, and that she had attempted after she came out, to repossess herself of what both Mi Michael and Thornburgh had. occupied, but without success.
I shall not follow the case through a long charge of the court before whom it was tried. Certain propositions were stated,by the eounsel for the plaintiffs and defendants. The plaintiffs requested the court to direct the jury,
First, if the jury believe that Gabriel Walker sold his land, his heirs are bound to convey it.
The court did not assent to the proposition as applicable to this ease, and they were right. Generally where a man sells land, and payment is made to him or his heirs, the heirs must convey it if their ancestors did not: but there are many exceptions. An improvement right differs from most other rights, and particularly in ■ this; it may be perfectly good when sold, yet, if the purchaser suffers others to settle within it, or to survey in parts of it, and makes no objection, such settlements or surveys may take away parts of the land, and the vendor or his heirs be in no respect responsible. The purchaser may desert and abandon his improvement so completely, that it may become open to be appropriated by any person as vacant land, and thus lost entirely, and the vendor or his heirs be in no respect answerable;, what was a good and valid title, being wholly or partly lost, not from original defect of right, but by the subsequent negligence or abandonment of the purchaser. A property may be sold, the boundaries of which are undefined. If those who adjoin it, among whom is the vendor, are suffered to define and limit their own rights, and do so, and no objection made for thirty or more years, it is believed no court of equity ever decreed a specific performance in such case, if by so doing it must change boundaries long established; but, if the vendor has sold, and his vendee possessed without interruption; if the vendor has died, and his children divided his estate, or one of them taken at an appraisement, and paid his brothers and sisters for what his father and himself, after his father’s death, had occupied thirty years, it would repeal our act of limitation, and overturn all its principles, which secure property and estates, to make such heirs liable to complete in its letter a contract which has been suffered to sleep so long. Here no one witness undertakes to designate the boundaries of what G. Walker is said to have sold. If he had a patent for the land, and sold by its lines in 1776 — had entered on land within those lines in 1783, and sold part, and occupied other parts ás his own, *383 his children entered after him, divided or appraised by public inquest of record in our courts, and no claim for thirty years after the entry and occupation of their father, the statute of limitation would protect them; and shall it not against a vague claim which no witness defines, no two witnesses agree as to the nature and description of, and which the present owners never attempted to designate from 1776 till 1810.
Second point. — If Boyd had notice of Stewart’s claim when he settled, his improvement purchase arid residence will not protect him, and this is agreed by the court to be the law. He who purchases with notice of an adverse claim, has not all the advantage of a purchaser without notice; but, if he purchased from one who claimed in his own right, and is suffered to continue until he can show twenty-one years’ continued possession, the statute of limitations protects him: notice of his title by a person out of possession does not prevent the statute from running in favour of one in possession, and claiming adverse to such title. There was error then in the answer to this point.
Third point. — That the heirs of Walker buying from Boyd, with notice of Stewart’s claim, hold as trustees. Where the counsel found any thing on which to found the second, and this third proposition, I cannot discover. It was said G. Walker covenanted to make Boyd a title founded on patent, and having neglected to do so, Boyd, in 1799, took a bond and security, that his title should be made according to the covenant, and John M‘Michael says, Boyd, while living on the said land, said he was afraid of contention, and would sell; but that Mrs. Stewart ever claimed Boyd’s land or any part of it, or that he thought she did, is neither said nor surmised by any witness; nay, it is proved by her own witness, that she never did claim the part, once Boyd’s, up to the survey of the 8th of March, 1810, and would not then have included it, but for his, (Mi Michael’s) suggestion. From what I have said, the length of time, extent of improvement, delay of claim, &c., had made an end of all claim on the part of the plaintiffs, on the facts proved. If other and different evidence shall be given, the case may be altered.
The fifth and sixth points apply to the warrant of Mary Walker, and the land surveyed on it; or to any warrant which Gabriel Walker or Isaac Walker could take out for that land. The seventh, is the fifth repeated. Who took out the warrant of Mary Walker, is not stated or proved in the case, nor do the counsel agree. It was not in evidence, though much was and is said about it. What land it calls for we do not know: whether Gabriel’s survey, made before 1780, was on this warrant or without warrant we do not know; we do know it was applied to that old survey, in 1817. I shall then say nothing about it; the answers of the court to these, and to the first of the defendant’s proposition, viz., hat prior to the entry of Mary Stewart in 1795, she had no ti- *384 tie to the land on which the plaintiff resided, the improvement of Branner and Scott not giving, any title to the land: and the second, that the plaintiffs are bound by the fifth section of the act of limitatibn, of 1785, which, I understand, is the first repeated in other words, call for some observation; much of the answers of the court are founded on facts contained in the depositions, which cannot be read at next trial. The same, or similar facts may, however, be proved by others.
The fifth section of the act of 17S5, has received repeated construction in our courts: the cases are collected in a note in 2 Smith’s Laws, on this act; the inconvenience and confusion anticipated from bringing up old claims to improvements, struck the legislature so forcibly, that there is in this section no saving for married women, nor for infants. And it has frequently been decided, that unless the claim was not pursued within the five years, it was totally gone for ever. The case of one who surveyed on such a claim before the five years had expired, came before this court in Magens’s Lessee v. Smith, 4 Binn. 73.
It was contended that a survey on land, to which an improved right existed, was totally void; but decided that it was voidable, if the owner of the improvement came and claimed within the period: if no such claim made, the law extinguished the improvement claim, and the warrant and survey became a valid title. Admitting, then, the title of Stewart and his heirs to have been good and indefeasible when Stewart left the land, his heirs were bound to renew the claim and resume the possession, or take a warrant before the 25th of March, 1790, or their title was gone. They did not do so, the land became vacant, and any person might settle on it, or take a warrant for it. It might appear ungracious in G. Walker to take part of it; but it was in law as open to his occupancy, as any other vacant land in the state.
But, it is. said, both he and Isaac took possession, not as claiming for themselves, but as agents and trustees for their sister, and this is the only feasible ground on which the plaintiffs have a shadow of claim. Part of what has been said applies to this part of the case. The doctrine that the statute of limitations does not apply in cases of trust, has been much misunderstood. It only applies in cases of express trust, when the rights of trustee and cestui que trust make but one title; where there is a confidence, or was a confidence, between the parties; and even then I will not say it applies where the trustee openly and distinctly denies the right of cestui que trust, asserts his claim and title, and holds possession adverse to him with his knowledge, &c. But it never applied to implied trusts; to all those cases, where he who has the legal title denies and disclaims all trusts, claims and acts in all cases and in all respects as sole and exclusive owner: much less does it apply to cases where, along with such occupation and claim, the party has the legal title of record, and the trust is to be made out by old *385 hearsays, vague recollections, and forgotten or abandoned claims. “ It is a misconstruction of the act of limitations,” says the late Chief Justice, “to say, that because a man once stood in the relation of trustee, he must stand so for ever, and lose all benefit from the act of limitations.” Pipher v. Lodge, 4 Serg. & Rawle, 316. To which case, and'the opinion of the present Chief Justice, in the same case, at the end of the volume, 1 refer for the law on this subject. It is not true that an open, continued, adverse possession will bar a title, perfect both at law and in equity, and the same possession will not bar a vague, uncertain, indefinite claim. If then the facts prove in the defendants, or any of them, an open, notorious, or adverse possession and claim, in their own right, for the space required by the act of limitations, the title of the plain'tiffs is extinguished by that act; and each section of it is equally operative and conclusive. The first or the fifth are equally in force, and equally protect the party whose case is within them; and neither of them is to be frittered away and destroyed, by giving a particular name to a claim, or by raising doubts, as to how the rights of the parties once stood.
Judgment reversed, and a venire facias de novo awarded.